******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ERICA LAFFERTY ET AL. *v.* ALEX
EMRIC JONES ET AL.

WILLIAM SHERLACH *v.*
ALEX JONES ET AL.

WILLIAM SHERLACH ET AL. *v.*
ALEX EMRIC JONES ET AL.
(SC 20327)

Robinson, C. J., Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The plaintiffs, a first responder and family members of those killed in the mass shooting at Sandy Hook Elementary School, commenced separate actions, which the trial court consolidated, seeking to recover damages from the defendants, J and several of his affiliated corporate entities, for, inter alia, invasion of privacy, arising out of statements made by J on his radio show advancing certain conspiracy theories about the shooting. The defendants filed special motions to dismiss the plaintiffs' complaints pursuant to the statute (§ 52-196a (b)) permitting the court to dismiss a complaint that is based on the opposing party's exercise of its constitutional right to free speech in connection with a matter of public concern. The plaintiffs moved for limited discovery pursuant to § 52-196a (d) in order to respond to the special motions to dismiss. The trial court found good cause for limited discovery and ordered the defendants to comply by a certain date, but they failed to meet that deadline. The defendants then filed motions for an extension of time within which to produce the discovery materials. The court granted the motions but warned that, if the defendants continued to ignore deadlines, they would be foreclosed from pursuing their special motions to dismiss. Two days before the new deadline, the defendants again moved for an extension of time, but the court denied the motions, explaining that the defendants had not substantially complied with its discovery orders. On that basis, the plaintiffs moved for sanctions. At the hearing on the sanctions motions, the defendants argued that, by that time, they had responded to almost every discovery request and were in substantial compliance. The court agreed and concluded that their production was sufficient to allow them to pursue their special motions to dismiss. Subsequently, in response to the plaintiffs' request, the trial court ordered the defendants to produce certain marketing data and a complete search of J's cell phone, again warning that it would consider appropriate sanctions if the defendants failed to comply. Shortly thereafter, J and his attorney appeared together on J's radio show to discuss the case, during which J explained that someone had embedded child pornography in e-mails he had turned over to the plaintiffs in discovery. J then went on a long tirade against those whom he believed had planted the child pornography, during which he implicated the plaintiffs' attorney, M, accused M of committing a felony, threatened M, declared war on M, and promoted a $1 million bounty. Shortly after the broadcast, the parties appeared before the court and argued whether the court should order sanctions as a result of the broadcast. After hearing arguments, the court imposed sanctions against the defendants and revoked their opportunity to pursue the merits of their special motions to dismiss, basing its decision on the facts that the defendants had not complied with its discovery orders and that J had harassed, intimidated, and threatened M. Following the court's imposition of sanctions, the defendants appealed pursuant to the statute (§ 52-265a) permitting the Chief Justice to certify an interlocutory appeal involving a matter of substantial public interest. *Held*:

1. The trial court did not violate the defendants' first amendment rights when it imposed sanctions on the basis of J's broadcast because, considering J's role as a party in the litigation and the threatening nature of his speech, J's broadcast presented an imminent and likely threat to the administration of justice: this court concluded that, if extrajudicial

speech by a party to litigation poses an imminent and likely threat to the administration of judicial proceedings, a court may sanction a party for that speech, without violating the first amendment, to the extent necessary to protect the fairness of the litigation and taking into consideration the timing and the nature of the speech; J's status as a party to the litigation and the threatening and vituperative nature of his speech served to confirm the imminence and likelihood of the threatened harm, J, as a party commenting on his own litigation, had a greater opportunity and perceived incentive to affect the outcome of the cases than a nonparty criticizing a judicial action, and J's speech was threatening and intimidating, led to additional threats against the trial judge and the plaintiffs' counsel, and created a hostile atmosphere that could discourage individuals from participating in the litigation and pose a threat to the plaintiffs' ability to litigate their cases; moreover, the court penalized the defendants in a restrained manner in order to preserve the judicial process, and the sanctions imposed were narrowly tailored to achieving the government's substantial interest in ensuring the administration of justice, as the court refrained from imposing a more severe sanction, such as defaulting the defendants or holding them in contempt, and, instead, merely revoked a statutory benefit, namely, the opportunity to pursue their special motions to dismiss.

2. The trial court did not abuse its discretion by sanctioning the defendants, as it was undisputed that the court's discovery orders were reasonably clear and that the defendants violated four of them, and revoking the defendants' opportunity to pursue the special motions to dismiss was proportional to their discovery violations and in light of the nature of J's broadcast: the record supported the trial court's finding that the defendants wilfully disregarded the discovery orders and continued to challenge the underlying merits of the limited discovery despite the court's finding that it was supported by good cause, and the defendants' noncompliance was prejudicial to the plaintiffs because the undisclosed discovery material could have assisted the plaintiffs in proving probable cause that they would succeed on the merits of their complaints; moreover, the sanctions imposed were proportional in light of the defendant's wilful, repeated violations of deadlines, when considered in combination with J's harassment and intimidation of M during the broadcast, and measured insofar as the sanctions fell short of a judgment of default or dismissal and, instead, merely required the defendants to adjudicate the merits of the cases in the ordinary course of litigation rather than through their special motions to dismiss; furthermore, the defendants' claim that the sanctions were inappropriate because the limited discovery itself was overbroad did not excuse their failure to comply with the court's orders.

3. The defendants' claim that the trial court denied them their right to due process by imposing sanctions without adequate notice and a meaningful opportunity to be heard was unavailing: the plaintiffs had filed an earlier motion seeking sanctions for the defendants' discovery noncompliance, and the court repeatedly discussed the possibility of sanctioning the defendants, including warning that it would revoke their opportunity to pursue the special motions to dismiss, and issued an order stating that it would address J's broadcast at a hearing to be held the following day; moreover, the court heard thorough argument on the issue of sanctions at the hearing on the broadcast, and at no point did the defendants request additional time to prepare.

Argued September 26, 2019—officially released July 23, 2020**

*Procedural History*

Action, in the first case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the defendant Alex Emric Jones et al. filed a special motion to dismiss, action, in the second case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Bellis, J.*, granted the plaintiff William Sherlach's motion to add Robert Parker as a plaintiff, and the defendant Alex

Jones et al. filed a special motion to dismiss, and action, in the third case, to recover damages for, inter alia, invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the defendant Alex Emric Jones et al. filed a special motion to dismiss; thereafter, the cases were consolidated and transferred to the Complex Litigation Docket, judicial district of Waterbury; subsequently, the court, *Bellis, J.*, granted the motions for sanctions filed by the plaintiffs in each case, and the defendant Alex Emric Jones et al., upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest was at issue, appealed to this court. *Affirmed.*

*Norman A. Pattis*, with whom was *Kevin Smith*, for the appellants (named defendant et al.).

*Joshua D. Koskoff*, with whom was *Alinor C. Sterling*, for the appellees (plaintiffs).

*Opinion*

ROBINSON, C. J. This public interest appeal presents the opportunity to consider the scope of a trial court's inherent authority to sanction a party to litigation for his or her remarks about the case in light of that party's right to free speech under the first amendment to the United States constitution. The plaintiffs in these cases, a first responder and family members of those killed in the mass shooting at Sandy Hook Elementary School,[1] brought these actions against the defendants, Alex Emric Jones and several of his affiliated corporate entities,[2] claiming that statements made on Jones' radio show advancing certain conspiracy theories about the Sandy Hook shooting were tortious in nature. The defendants appeal[3] from the orders of the trial court sanctioning them by revoking their opportunity to pursue the special motions to dismiss provided by Connecticut's anti-SLAPP[4] statute, General Statutes § 52-196a,[5] issued after the trial court found that the defendants had violated numerous discovery orders and that Jones personally had engaged in harassing and intimidating behavior directed at the plaintiffs' counsel, Attorney Christopher Mattei. On appeal, the defendants claim, inter alia, that the trial court (1) improperly sanctioned the defendants because Jones' speech was protected under the first amendment, and (2) abused its discretion in sanctioning the defendants because the trial court improperly permitted discovery that exceeded the limited scope contemplated by § 52-196a (d). The defendants also claim that the trial court violated their due process rights by failing to afford them sufficient notice and a meaningful opportunity to be heard before issuing the sanctions orders. We disagree and, accordingly, affirm the trial court's sanctions orders.

The record reveals the following relevant facts and procedural history. On December 14, 2012, Adam Lanza murdered twenty children and six staff members in a mass shooting at Sandy Hook Elementary School in Newtown. Some conspiracy theorists questioned the circumstances surrounding the shooting and called it a hoax. In response to statements made by Jones and other individuals featured on his radio show, the plaintiffs brought three separate civil actions against the defendants in 2018. The complaints alleged counts of invasion of privacy by false light, defamation and defamation per se, intentional infliction of emotional distress, and negligent infliction of emotional distress, all of which were accompanied by counts of civil conspiracy. In addition, the complaints claimed violations of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The trial court consolidated all three cases.

In November, 2018, the defendants filed special motions to dismiss the plaintiffs' complaints pursuant to the anti-SLAPP statute. See General Statutes § 52-196a

(b). In order to respond to the special motions to dismiss, the plaintiffs moved for limited discovery pursuant to § 52-196a (d). The plaintiffs argued that they had demonstrated good cause to entitle them to "specified and limited discovery relevant to the special motion[s] to dismiss" pursuant to § 52-196a (d) and asked the trial court to permit discovery on every issue raised by the defendants' special motions to dismiss to allow them to demonstrate probable cause of success on the merits of their complaints. See General Statutes § 52-196a (e) (3). The defendants opposed the plaintiffs' motion for limited discovery, claiming that the plaintiffs' broad discovery requests were contrary to the purpose of the anti-SLAPP statute and that the plaintiffs had failed to show good cause.

With respect to the specific discovery requests, the plaintiffs initially requested five special interrogatories and twenty-one requests for production from Jones.[6] At a hearing on December 17, 2018, the trial court found good cause and granted the plaintiffs' motion for limited discovery but indicated that it would not grant all of the plaintiffs' requests and would consider each of the defendants' objections individually. The trial court then allowed the parties numerous opportunities to mediate disputes and delineate their discovery obligations at discovery status conferences.

After narrowing the plaintiffs' requests, the trial court initially ordered the defendants to produce their discovery compliance by February 23, 2019. The defendants failed to meet that deadline.[7] The defendants then filed motions for an extension of time, which the trial court granted, allowing them until March 20, 2019, to produce their discovery materials. In granting the motions, the trial court "urge[d] the defendants to honor this court ordered deadline because the defendants are the ones [who] want their motion[s] to dismiss adjudicated, but if they're going to continue to ignore court deadlines, they're going to lose the ability . . . to pursue their [special] motion[s] to dismiss."

Two days before the March 20, 2019 discovery deadline, the defendants again moved for an extension of time. This time, the trial court denied the motions, indicating at a hearing with the parties that the defendants had not substantially complied with its discovery orders. The trial court explained that the "defendants, at this point, are coming from a position of weakness. They've blown past the court's deadlines. There hasn't been a single piece of paper [produced] or interrogatory answered." In light of the defendants' noncompliance, the plaintiffs moved for sanctions on March 20, 2019. Specifically, the plaintiffs argued that, under Practice Book § 13-14[8] and the trial court's inherent authority, the court should impose sanctions for the defendants' violations of discovery deadlines.

At a hearing on April 3, 2019, the trial court began to

address the plaintiffs' motions for sanctions but delayed ruling on them to allow the defendants' counsel time to resolve an unspecified ethical concern. Subsequently, on April 10, 2019, the court heard argument on the motions for sanctions. The defendants argued that they had responded by that time to almost every discovery request and that they were in substantial compliance with the court's discovery orders. The trial court agreed with the defendants, concluding that, although they had not complied with every discovery request, the production to that point was sufficient to allow them to pursue the merits of the special motions to dismiss.

Subsequently, in late May, 2019, the plaintiffs brought additional discovery issues to the trial court's attention. Specifically, the plaintiffs requested, inter alia, additional responsive marketing data from Google Analytics and a complete search of Jones' cell phone. After another hearing, the trial court ordered the defendants to produce marketing data responsive to the court approved production requests. The court warned that it would "consider appropriate sanctions for the defendants' failure to fully and fairly comply" with its latest orders.

On Friday, June 14, 2019, Jones and his attorney, Norman A. Pattis, appeared together on Jones' radio broadcast to discuss the pending case. Jones explained to the broadcast audience that someone had embedded child pornography in e-mails turned over to the plaintiffs in discovery. Jones then began a long invective against those whom he believed had planted the child pornography, which we quote in relevant part:[9]

"Jones: I'm here to tell the little pimps, the Senator Murphys and the prosecutor, the Obama appointed prosecutor [who's] doing all this, bitch, I don't need to talk about poor dead kids to have listeners.

\* \* \*

"Jones: They say you're a pedophile. We knew it was coming. And when the Obama appointed [United States] attorney demanded, out of 9.6 million e-mails in the last seven years since Sandy Hook, metadata, which meant tracking the e-mails and where they went, well, we fought it in court. The judge ordered for us to release a large number of those e-mails. That's Chris Mattei [who] got that done, a very interesting individual with the firm of Koskoff & Koskoff run by Senator Murphy and Senator Blumenthal that say, for America to survive, quote, I must be taken off the air. . . .

"It was hidden. In Sandy Hook e-mails threatening us, there was child porn. . . . And they get these e-mails a few weeks ago, and they go right to the [Federal Bureau of Investigation (FBI)] and say, '[w]e've got him with child porn.' The FBI says, '[h]e never opened it. He didn't send it.' And then they act like, oh, they're our friends. They're not going to do anything with

this. . . .

"Now, I wonder who during discovery would send e-mails out of millions and then know what to search and look at. . . . One million dollars on conviction for who sent the child porn. . . . We're going to turn you loose, the [internet service providers], the law enforcement. You know who did it. . . .

"You think when you call up, oh, we'll protect you. We found the child porn. I like women with big giant tits and big asses. I don't like kids like you goddamn[ed] rapists, f-heads. In fact, you fucks are going to get it, you fucking child molesters. I'll fucking get you in the end, you fucks. . . . You're trying to set me up with child porn. I'm going to get your ass. One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your ass. You understand me now? You're not going to ever defeat Texas, you sacks of shit. So you get ready for that.

\* \* \*

"Jones: Why does law enforcement say $5000, dead or alive? One million. 'Cause we all know who did it.

\* \* \*

"Jones: What a nice group of Democrats. How surprising. What nice people. Chris Mattei, Chris Mattei. Let's zoom in on Chris Mattei. Oh, nice little Chris Mattei. What a good American. What a good boy. You think you'll put on me—anyways, I'm done. Total war. You want it? You got it. I'm not into kids like your Democratic party, you cocksuckers. So get ready. . . .

"Jones: The point is, I'm not putting up . . . with these guys anymore, man, and their behavior, 'cause I'm not an idiot. They literally went right in there and found this hidden stuff. Oh, my God. Oh, my God. And they're my friends. We want to protect you now, Alex. Oh, you're not going to get in trouble for what we found. F-U man, F-U to hell. I pray God, not anybody else, God visit[s] vengeance upon you in the name of Jesus Christ and all the saints. I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does.

\* \* \*

"Jones: I want them to. I want them to track it back to you know who. . . . I wonder who the person of interest is.

"Pattis: Look, are you showing Chris Mattei's photograph on here?[10]

"Jones: Oh, no. That was an accidental cut. He's a nice Obama boy. . . . He's a white . . . boy that thinks he

owns America.

\* \* \*

"Jones: That's why I said, one million. I'm not BS-ing. One million dollars when they are convicted. The bounty is out, bitches, and you know, you feds, they're going to know you did it. They're going to get your ass, you little dirt bag. One million, bitch. It's out on your ass. . . .

"Jones: One million—I pay all debts—one million is on the street for who sent me—and we're going to get the e-mails. We're going to publish them next week. And we're going to make a whole thing. We're not going to show the child porn, but we're going to put the e-mails out, and we're going to show you where they came from. One million on the street. . . .

"Jones: A million dollars is after them. So I bet you'll sleep real good tonight, little jerk. 'Cause your own buddies are going to turn you in, and you're going to go to prison, you little white . . . boy jerkoff. Son of a bitch. I mean, I can't handle them. They want war? They're going to get war. I am sick of these people, a bunch of chicken craps [who] have taken this country over [who] want to attack real Americans. . . .

"Jones: We're going to get them. One million. One million dollars is on the street against you. You didn't destroy America on time, bitch. I am pissed, man. I will give everything I have to stop living in this world with these people.

\* \* \*

"Jones: I am sure that [the United States] attorneys appointed by Obama are sweet little cupcakes. Come on. . . .

"Jones: I don't even think errand boy did this. I'm actually not saying that.[11] . . . And so, if they want war—you know, it's not a threat. It's like an AC/DC song. If you want blood, you've got it. Blood on the streets, man. . . .

"Jones: And I'm just asking the Pentagon and the patriots that are left, and 4chan and 8chan, and Anonymous, anybody [who's] a patriot, I am under attack, and if they bring me down, they'll bring you down. I just have faith in you. I'm under attack. And I summon the mean war. I summon all of it against the enemy. . . .

"Jones: . . . How would you like an Obama appointed [United States] attorney, man, [who] literally found a needle in a field of haystacks and tried to go to the feds and get me indicted? . . . And now I ask my listeners and everyone, you claimed I sent people. I never sent anybody. And I want legal and lawful action. But I pray to God that America awaken[s]. Will Texas be defeated? You will now decide. This is war." (Footnotes added.)

The very next Monday, June 17, 2019, the plaintiffs filed motions asking the trial court to review the broadcast. The plaintiffs also asked for "an expedited briefing schedule concerning what orders must issue in connection with [Jones'] on-air statements . . . ." In those motions, the plaintiffs explained that a data firm they had retained located child pornography in the defendants' metadata and that they "immediately contacted the FBI." That same day, the trial court issued an order that "[c]ounsel should be prepared to address the matter at tomorrow's hearing . . . ."

The next day, June 18, 2019, the parties appeared and argued whether the trial court should order sanctions as a result of the broadcast. After hearing argument, the trial court imposed sanctions against the defendants and revoked their opportunity to pursue the merits of their special motions to dismiss pursuant to § 52-196a (b).[12] This expedited public interest appeal followed. See footnote 3 of this opinion.

On appeal, the defendants claim that the trial court (1) improperly sanctioned them in violation of their first amendment rights, (2) abused its discretion in fashioning sanctions for discovery noncompliance, and (3) denied them due process by failing to afford them notice and a meaningful opportunity to be heard.

I

We begin with the defendants' challenge to the merits of the sanctions orders, which the trial court based on two grounds. First, the trial court found that the defendants were noncompliant with discovery, with their failure to comply with additional production deadlines viewed in light of their previous noncompliance. Second, the trial court found that, on the June 14, 2019 broadcast, Jones accused Mattei of committing a felony and then harassed, intimidated, and threatened him.[13] Because the trial court provided these two bases for its sanctions orders, we must assess the court's orders both for their propriety as sanctions and their constitutionality. We first conclude that the sanctions did not run afoul of the first amendment because they addressed speech that was an imminent and likely threat to the administration of justice. We also conclude that these two rationales, when considered together, provided sufficient grounds for sanctioning the defendants. Accordingly, it was not an abuse of the trial court's discretion to sanction the defendants for their discovery violations and Jones' vituperative speech.

A

We first consider whether the trial court's sanctions were permissible under the first amendment's free speech protections. The defendants argue that the trial court's ruling is "bereft of any analysis of the first amendment" and that the court's inherent authority is not an adequate ground to sanction them on the basis

of Jones' speech. The defendants further contend that, because Jones' broadcast was not a true threat, did not incite violence, and did not constitute fighting words, the trial court's sanction was impermissible under the first amendment. In response, the plaintiffs first submit that the sanctions were a constitutionally permissible exercise of the trial court's authority to sanction bad faith litigation misconduct, which includes the harassment and intimidation of opposing counsel. Second, the plaintiffs argue that the broadcast was not protected speech because it was a true threat. Although we agree with the defendants that a trial court's inherent authority is subject to constitutional limitations, we nevertheless conclude that Jones' speech during his June 14, 2019 broadcast was not protected by the first amendment because it posed an imminent and likely threat to the administration of justice.

It is well settled that a trial court "has the inherent authority to impose sanctions against an attorney and his client for a course of claimed dilatory, bad faith and harassing litigation conduct . . . ." (Internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999); see also R. Pushaw, "The Inherent Powers of Federal Courts and the Structural Constitution," 86 Iowa L. Rev. 735, 764–65 (2001) ("The inherent authority to administer judicial proceedings carries with it a corollary power to control those involved in court business—parties, witnesses, jurors, spectators, and lawyers—to maintain order, decorum, and respect. Sanctions have long been deemed imperative to protect against the disruption or abuse of judicial processes and to ensure obedience to a court's orders, thereby preserving its authority and dignity." (Footnote omitted.)).

A long line of decisions makes clear that this inherent authority to sanction a party extends to sanctioning participants to litigation for engaging in threatening and harassing behavior. See *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 188 Conn. App. 21, 22–23, 204 A.3d 71 (dismissing writ of error stemming from sanctions order, issued under court's inherent authority, against nonparty partner in defendant partnership for sending "an inappropriate e-mail" to opposing counsel and telling her to "sit on his fucking head" (internal quotation marks omitted)), cert. denied, 331 Conn. 923, 206 A.3d 765 (2019);[14] see also *Waivio* v. *Board of Trustees of the University of Illinois*, 290 Fed. Appx. 935, 936–37 (7th Cir. 2008) (affirming judgment of dismissal when plaintiff engaged in "delaying and threatening conduct in the course of the litigation," including threatening to kill opposing counsel), cert. denied, 557 U.S. 926, 129 S. Ct. 2842, 174 L. Ed. 2d 563 (2009); *Thomas* v. *Tenneco Packaging Co.*, 293 F.3d 1306, 1308 (11th Cir. 2002) (upholding sanctions against lawyer for

filings "directed at opposing counsel" that trial court "deemed abusive and offensive"); *Carroll* v. *Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 291–93 (5th Cir. 1997) (upholding sanction of defendant attorney who engaged in "abusive conduct at his deposition"); *Michael* v. *Boutwell*, 138 F. Supp. 3d 761, 785–87 (N.D. Miss. 2015) (concluding that defendant's threatening of witness warranted sanction of attorney's fees, expenses and $1000 fine but not dispositive sanction of default judgment); *Kalwasinski* v. *Ryan*, Docket No. 96-CV-6475, 2007 WL 2743434, *3 (W.D.N.Y. September 17, 2007) (dismissing self-represented inmate's federal civil rights action because he "deliberately and intentionally participat[ed] in making threats of physical harm against parties and witnesses in his case"); *Fidelity National Title Ins. Co. of New York* v. *Intercounty National Title Ins. Co.*, Docket No. 00 C 5658, 2002 WL 1433717, *12–13 (N.D. Ill. July 2, 2002) (dismissing defendant's counterclaims "[p]ursuant to [the court's] inherent authority to sanction bad faith conduct in litigation" on basis of his "abusive and threatening" letter to opposing counsel).

When acting under its inherent powers, a court should proceed with caution; "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). This cautionary approach requires that any exercise of the inherent power to sanction be limited by constitutional concerns, such as the requirements of due process. See, e.g., *Roadway Express, Inc.* v. *Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) ("[l]ike other sanctions, attorney's fees certainly should not be assessed lightly or without fair notice and an opportunity for a hearing on the record"); R. Pushaw, supra, 86 Iowa L. Rev. 784 ("[t]o be sure, the [c]ourt has recognized that the [c]onstitution limits federal judges' inherent powers"). As a result, a trial court's exercise of its inherent authority to sanction a party for harassing or threatening speech in the context of litigation is limited by the protections of the first amendment.[15] "The [f]irst [a]mendment requires courts to tread warily when restricting litigants' speech. They may do so only when necessary to protect the fairness or integrity of the particular litigation before them." *Bank of Hope* v. *Chon*, 938 F.3d 389, 397 (3d Cir. 2019); see also *Economy Carpets Manufacturers & Distributors, Inc.* v. *Better Business Bureau of Baton Rouge Area, Inc.*, 330 So. 2d 301, 304 (La. 1976) ("the judicial authority, as all powers of government, is not without limit, and [when] it is asserted an individual's right of free speech has been abridged by the exercise of that power, the burden is [on] us to define its limitations"). Speech that might otherwise be protected may be restricted under certain circumstances because of pending judicial proceedings. See, e.g., *In re Brianna B.*, 66 Conn. App. 695, 701, 785 A.2d 1189 (2001) ("[t]he

[United States Supreme Court] has . . . emphasized the vitality of individual rights to free speech during legal proceedings, such as discovery, but that the right to free speech is not without limit").

Fundamental first amendment principles guide our analysis of the defendants' claims in this appeal. "The [f]irst [a]mendment, applicable to the [s]tates through the [due process clause of the] [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas— even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies [the government] the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The [f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech. . . . The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution." (Internal quotation marks omitted.) *State* v. *Moulton*, 310 Conn. 337, 348–49, 78 A.3d 55 (2013), quoting *Virginia* v. *Black*, 538 U.S. 343, 358, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

Whether the trial court's sanctions constitute an impermissible restriction on the defendants' speech presents a question of law, over which our review is plenary. "In certain first amendment contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. *New York Times Co.* v. *Sullivan*, [376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)]. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the

rule of independent review." (Internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 446–47, 97 A.3d 946 (2014). However, "the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact." Id., 447.

Whether judicial sanctions imposed for extrajudicial statements made by a party to pending litigation run afoul of the first amendment presents a question of first impression in Connecticut. We find instructive the test that the United States Supreme Court has adopted for considering the constitutionality of contempt as a sanction for out-of-court statements commenting on judicial proceedings.[16] The leading case is *Bridges* v. *California*, 314 U.S. 252, 275–77, 62 S. Ct. 190, 86 L. Ed. 192 (1941), in which the Supreme Court considered whether a union leader could be held in contempt when a newspaper published statements that he had made threatening a strike. The court considered whether the speech presented a "clear and present danger" to the administration of justice. Id., 261–262, 273. Specifically, the court analyzed "the particular utterances . . . in question and the circumstances of their publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify summary punishment." Id., 271. The court reversed the contempt finding because it concluded that a threat to call an impending strike, which the court observed was a *legal* course of action,[17] had not interfered with the administration of justice. Id., 277–78.

Subsequently, in *Craig* v. *Harney*, 331 U.S. 367, 368, 375–78, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947), the court applied *Bridges* to a contempt finding imposed for news articles that criticized a judge's ruling and discussed the community's response. Illuminating further clear and present danger, the court explained: "The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute *an imminent, not merely a likely,* threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." (Emphasis added.) Id., 376. In *Craig*, the court deemed speech critical of an elected judge "appropriate, if not necessary." Id., 377. Because "there was . . . no threat or menace to the integrity of the trial"; id.; the court held that the speech was protected. Id., 378.

The Supreme Court again considered the applicability of *Bridges* in *Wood* v. *Georgia*, 370 U.S. 375, 82 S. Ct. 1364, 8 L. Ed. 2d 569 (1962). In *Wood*, a state court judge convened a grand jury to investigate election law violations, and a local sheriff published a written statement outside of court criticizing the judge and the investigation, which was made available to the grand jury. Id., 376–80, 393. As a result, the state judge held the

sheriff in contempt. Id., 380. The Supreme Court concluded that, "in the absence of some other showing of a substantive evil actually designed to impede the course of justice in justification of the exercise of the contempt power to silence the [sheriff], his utterances are entitled to be protected." Id., 389. The court emphasized that *Wood* did not involve a trial or a "judicial proceeding pending" in which such speech could result in prejudice to the other side. (Internal quotation marks omitted.) Id. The court reversed the state court's order of contempt because the sheriff's speech did not pose a clear and present danger to the administration of justice in the absence of evidence of "actual interference"[18] with the grand jury investigation. Id., 393, 395.

But, as first amendment case law has progressed, the clear and present danger standard articulated in *Bridges* has been subject to criticism. For example, Justice William O. Douglas excoriated the use of clear and present danger in his concurrence in *Brandenburg* v. *Ohio*, 395 U.S. 444, 452–54, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969). See also, e.g., T. Emerson, "Toward a General Theory of the First Amendment," 72 Yale L.J. 877, 912 (1963) ("There is still some blood remaining in the doctrine, and it has continued to be used in certain types of situations. But, as a general test of the limits of the first amendment, [clear and present danger] must be regarded as unacceptable." (Footnote omitted.)). One major criticism is the ease with which the test may be manipulated to include protected speech. See *Brandenburg* v. *Ohio*, supra, 454 (Douglas, J., concurring) ("When one reads the opinions closely and sees when and how the 'clear and present danger' test has been applied, great misgivings are aroused. . . . [T]he threats were often loud but always puny and made serious only by judges so wedded to the status quo that critical analysis made them nervous."); L. Kendrick, "On 'Clear and Present Danger,'" 94 Notre Dame L. Rev. 1653, 1660 (2019) (explaining that clear and present danger test "has been criticized time and again for depending too much on circumstances and thereby giving judges too much discretion and failing to give speakers proper notice of the legality of their activities" (footnotes omitted)).

Although the United States Supreme Court has not directly rejected clear and present danger, the court has alluded to its evolution as a first amendment doctrine. For example, Justice David Souter, in his concurrence in *Denver Area Educational Telecommunications Consortium, Inc.* v. *Federal Communications Commission*, 518 U.S. 727, 778, 116 S. Ct. 2374, 135 L. Ed. 2d 888 (1996), argued that clear and present danger has evolved into the incitement test from *Brandenburg*, under which "constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or

producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio*, supra, 395 U.S. 447. The United States Supreme Court also alluded to this divergence in *Landmark Communications, Inc.* v. *Virginia*, 435 U.S. 829, 98 S. Ct. 1535, 56 L. Ed. 2d 1 (1978), stating: "The Supreme Court of Virginia relied on the [clear and present danger] test . . . . We question the relevance of that standard here; moreover we cannot accept the mechanical application of the test which led that court to its conclusion. [The] test was never intended 'to express a technical legal doctrine or to convey a formula for adjudicating cases.' " Id., 842. Nevertheless, the court went on to apply the test and hold that a newspaper article that disclosed confidential information did not meet the test. Id., 844–45.

More recently, the United States Supreme Court considered a similar issue to that presented in this case in the context of attorney speech. See generally *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991). In *Gentile*, the court concluded that a "substantial likelihood of material prejudice" standard was a constitutionally permissible standard to limit extrajudicial attorney speech. (Internal quotation marks omitted.) Id., 1075. In the absence of an express indication from the Supreme Court that a lower standard is permissible, we decline to extend the court's holding in *Gentile* to nonattorneys. This is because the court supported its reasoning by relying on the special status of attorneys, demonstrated through the government's role in attorney regulation and rules already in existence restricting attorney speech. See id., 1066–74. The court specifically declined to state which standard would apply to the speech of nonattorneys. See id., 1072–73 n.5 (noting that rule being interpreted did not apply to nonattorneys or attorneys outside of pending case).

Courts after *Gentile* have continued to apply clear and present danger to extrajudicial speech in certain circumstances. See, e.g., *In re Kendall*, 712 F.3d 814, 826 (3d Cir. 2013) (applying clear and present danger when analyzing whether judge was improperly held in criminal contempt for speech contained in judicial opinion); *Standing Committee on Discipline* v. *Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995) (applying clear and present danger to attorney speech outside of pending judicial proceeding); *United States* v. *Bingham*, 769 F. Supp. 1039, 1045 (N.D. Ill. 1991) (concluding that defense counsel's speech in televised interview on eve of jury selection constituted clear and present danger). For example, the court in *In re White*, Docket No. 2:07CV342, 2013 WL 5295652, *24–26, *68 (E.D. Va. September 13, 2013), considered whether sanctions for attorney's fees should enter as a result of a nonparty's allegedly threatening speech. The court analyzed this request for sanctions in light of different first amendment tests, including clear and present danger.[19] See

id., *70 ("[a]lthough there is some indication that *Brandenburg*'s more stringent standard—incitement to imminent lawlessness—has displaced the 'clear and present danger' test articulated in . . . earlier cases, the [c]ourt observes that some post-*Brandenburg* cases continue to apply the 'clear and present danger' test to court restrictions of speech threatening the due and orderly administration of justice" (footnote omitted)). The court determined that there was "no indication" that White's online statements had "disrupted or interfered with a [c]ourt proceeding, [or] that his commentary was imminently likely to so interfere," and, as such, his speech did not pose "a serious and imminent threat to the administration of justice." (Emphasis omitted; internal quotation marks omitted.) Id. This lack of clarity surrounding clear and present danger, as noted in *In re White*, similarly leaves open the question of what standard applies to the speech of *parties to the litigation*. See *Wilson* v. *Moore*, 193 F. Supp. 2d 1290, 1293 (S.D. Fla. 2002) (applying clear and present danger test to speech of criminal defendant made during appeal process).

"The [United States] Supreme Court has held that speech otherwise entitled to full constitutional protection may nonetheless be sanctioned if it obstructs or prejudices the administration of justice." *Standing Committee on Discipline* v. *Yagman*, supra, 55 F.3d 1442, citing *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1074–75, and *Sheppard* v. *Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Importantly, "[a] rule governing speech, even speech entitled to full constitutional protection, need not use the words 'clear and present danger' in order to pass constitutional muster." *Gentile* v. *State Bar of Nevada*, supra, 1036 (Kennedy, J.). Because the Supreme Court has not yet clearly supplanted clear and present danger in the area of extrajudicial speech, we will use it as a guideline in our analysis. Even still, it is necessary to refine the standard to our present circumstances to incorporate the requirements of *Brandenburg* and the inquiries outlined in *Gentile*. "Properly applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression." *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. 842–43; see also *Turney* v. *Pugh*, 400 F.3d 1197, 1202 (9th Cir. 2005). We conclude that, if extrajudicial speech by a party to litigation poses an imminent and likely threat to the administration of judicial proceedings at issue, a court may sanction a party for that speech.

It is necessary to outline certain factors that affect whether extrajudicial speech threatens the administration of justice. "The [United States Supreme] Court gave two principal reasons for adopting this lower threshold

[in *Gentile*], one concerned with the identity of the speaker, the other with the timing of the speech." *Standing Committee on Discipline* v. *Yagman, supra,* 55 F.3d 1442; see *In re Hinds,* 90 N.J. 604, 609, 449 A.2d 483 (1982) (in using reasonable likelihood standard, "the determination of whether a particular statement is likely to interfere with a fair trial involves a careful balancing of factors, including consideration of the status of the attorney, the nature and timing of the statement, as well as the context in which it was uttered"); see also *In re Hinds, supra,* 622–23. As a result, we, too, will consider such factors.

If the speaker is a party to litigation, the government's interest in ensuring the fair administration of justice is heightened, especially if the trial involves a criminal defendant. See *Chicago Council of Lawyers* v. *Bauer,* 522 F.2d 242, 248 (7th Cir. 1975) ("[t]hat courts have the duty to ensure fair trials—'the most fundamental of all freedoms'—is beyond question" (footnote omitted)), cert. denied sub nom. *Cunningham* v. *Chicago Council of Lawyers,* 427 U.S. 912, 96 S. Ct. 3201, 49 L. Ed. 2d 1204 (1976); id., 257–58 ("we require even a greater insularity against the possibility of interference with fairness in criminal cases"). Judicial restrictions on a litigant's speech are more permissible than judicial restrictions on comments made by an outsider to the litigation, such as the press. See *In re Application of Dow Jones & Co.,* 842 F.2d 603, 608 (2d Cir.) ("there is a substantial difference between a restraining order directed against the press—a form of censorship which the [f]irst [a]mendment sought to abolish from these shores—and the order here directed solely against trial participants"), cert. denied sub nom. *Dow Jones & Co.* v. *Simon,* 488 U.S. 946, 109 S. Ct. 377, 102 L. Ed. 2d 365 (1988); see also *Standing Committee on Discipline* v. *Yagman, supra,* 55 F.3d 1443 ("[w]hen lawyers speak out on *matters unconnected to a pending case,* there is no direct and immediate impact on the fair trial rights of litigants" (emphasis added)).

Relying in part on the distinction made in *Gentile* between trial participants and those outside the litigation, the Fifth Circuit declined to apply the stringent clear and present danger standard to a trial participant gag order. *United States* v. *Brown,* 218 F.3d 415, 426–27 (5th Cir. 2000), cert. denied, 531 U.S. 1111, 121 S. Ct. 854, 148 L. Ed. 2d 769 (2001). In *Brown,* the court decided that the lower standard in *Gentile* may be extended to nonattorney litigation participants, as there was "no reason . . . to distinguish between [attorneys and parties] for the purpose of evaluating a gag order directed at them both." Id., 428; see also *State* v. *Carruthers,* 35 S.W.3d 516, 562–63 (Tenn. 2000) (declining to apply clear and present danger test to trial participants), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001). We decline to completely extend the reasoning in *Brown* to this case and instead invoke a higher stan-

dard reminiscent of clear and present danger that takes into account the speaker's identity. See *Commission for Lawyer Discipline* v. *Benton*, 980 S.W.2d 425, 431 (Tex. 1998) (describing "the *Gentile* standard [as] a constitutional minimum"), cert. denied, 526 U.S. 1146, 119 S. Ct. 2021, 143 L. Ed. 2d 1033 (1999). We recognize that Jones' position, as a civil defendant, presents a different situation than a plaintiff, who affirmatively requests a court's jurisdiction over her case. See *United States* v. *Carmichael*, 326 F. Supp. 2d 1267, 1294 (M.D. Ala. 2004) (declining to apply lower standard in *Gentile* to criminal defendant). Accordingly, we afford Jones the benefit of the doubt and engage in the most rigorous and searching review of any infringement of his first amendment rights.

Courts must have the ability to restrict the rights of participants to the extent necessary to protect the fairness of the litigation. "Although litigants do not surrender their [f]irst [a]mendment rights at the courthouse door . . . those rights may be subordinated to other interests that arise in this setting. For instance, on several occasions [the] [c]ourt has approved restriction on the communications of trial participants where necessary to ensure a fair trial for a criminal defendant. . . . In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors." (Citations omitted; internal quotation marks omitted.) *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32–33 n.18, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984). "Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function." (Internal quotation marks omitted.) *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1072. "[The United States Supreme Court] expressly contemplated that the speech of those participating before the courts could be limited. This distinction between participants in the litigation and strangers to it is brought into sharp relief by [the] holding in *Seattle Times Co.* v. *Rhinehart*, [supra, 20]." (Emphasis omitted; footnote omitted.) *Gentile* v. *State Bar of Nevada*, supra, 1072–73. "The primary danger of extrajudicial speech to the administration of justice must be that the outcome of a judicial proceeding, or the ability of the court to do its work, might be improperly influenced by people who have no legitimate part in the courts' resolution of that matter. Of course, the person making an extrajudicial statement might actually be a party in an ongoing proceeding. Or, an out-of-court statement might not affect any pending matter, but might influence the course of some future proceeding. The point is that an attempt to interfere with the outcome of a case is properly punishable because justice is being affected through means other than those established for the proper disposition of a controversy." L. Raveson, "Advocacy and Contempt: Constitutional Limitations on the Judicial Contempt Power; Part One: The

Conflict Between Advocacy and Contempt," 65 Wash. L. Rev. 477, 499–500 (1990).

A related, but necessary inquiry, considers the timing and the nature of the speech. Speech is more likely to interfere with the administration of justice if it is calculated to intimidate or threaten other participants in the litigation. "It is without question that courts may sanction parties and their attorneys who engage in harassment of their opponents. . . . The [f]irst [a]mendment does not shield improper tactics used by litigants to advance their interests, even if those tactics involve communication of a message." (Citation omitted.) *B. Willis, C.P.A., Inc.* v. *Goodpaster*, 183 F.3d 1231, 1234 (10th Cir.), cert. denied sub nom. *Willis* v. *Goodpaster*, 528 U.S. 1046, 120 S. Ct. 581, 145 L. Ed. 2d 483 (1999); see *D'Agostino* v. *Lynch*, 382 Ill. App. 3d 960, 970, 887 N.E.2d 590 ("harassing the court and the litigants appearing before it" was "calculated to disrupt court proceedings and bring the administration of law into disrepute"), appeal denied, 229 Ill. 2d 619, 897 N.E.2d 250 (2008); *Fidelity National Title Ins. Co. of New York* v. *Intercounty National Title Ins. Co.*, supra, 2002 WL 1433717, *11 ("A party's use of anonymous letters to opposing counsel to sabotage the litigation is an abuse of the judicial process. Anonymous, threatening letters prevent a speedy, open, and just resolution of the dispute on its merits.").

Additionally, "[t]he possibility that other measures will serve the [s]tate's interests should also be weighed." *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. 843. We also consider whether the sanction is narrowly tailored to achieve the government's substantial interest in ensuring the administration of justice. *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1075.

Our analysis also is informed by several cases from our sister states' appellate courts applying the clear and present danger standard to uphold contempt findings arising from statements by litigants.[20] In one recent decision, the Georgia Court of Appeals upheld the contempt conviction of a witness who, while at the courthouse as a character witness in his son's criminal trial, insulted the minor victim's mother in the hallway outside the courtroom and "exclaim[ed] that he hoped God would make the children and grandchildren of those who lied about his son suffer in the same way his son was currently suffering." *Moton* v. *State*, 332 Ga. App. 300, 300, 772 S.E.2d 393 (2015). An Illinois appeals court upheld a contempt conviction after the contemnor filed a motion alleging, inter alia, that the opposing parties and their attorney were part of the Mafia and had bribed the presiding judge. See *D'Agostino* v. *Lynch*, supra, 382 Ill. App. 3d 961. In that case, the court stated that "[c]omments that are systematically designed to thwart the judicial process constitute a 'clear and present danger' to the administration of justice" and concluded that the

"unsubstantiated accusations" against the judge qualified. Id., 970–72; see also *People* v. *Goss*, 10 Ill. 2d 533, 536–37, 141 N.E.2d 385 (1957) (upholding contempt order under clear and present danger test when nonparty appeared on television show and accused party to court proceeding of being from "a family with [court admitted] hoodlum connections" and called witness "professional sneak and liar" (internal quotation marks omitted)).

In establishing the constitutional bounds of the court's authority, we also find instructive those cases concluding that the litigant's conduct did not present a clear and present danger to the administration of justice. See *Pennekamp* v. *Florida*, 328 U.S. 331, 336–39, 348, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946) (publishers of editorials and cartoon critical of judges did not pose clear and present danger); *Garland* v. *State*, 253 Ga. 789, 789, 791, 325 S.E.2d 131 (1985) (reversing contempt conviction of attorney whose remarks criticizing judge for violating judicial ethics and conducting "sham proceeding" were published in newspaper (internal quotation marks omitted)); *Worcester Telegram & Gazette, Inc.* v. *Commonwealth*, 354 Mass. 578, 579–83, 238 N.E.2d 861 (1968) (reversing contempt convictions of publisher and reporter, whose newspaper article inferred that defendant in pending criminal proceeding previously had been "convicted of a serious crime" leading to mistrial, because they did not purposefully try to affect trial's outcome); *In re Contempt of Dudzinski*, 257 Mich. App. 96, 106–107, 667 N.W.2d 68 (reversing contempt conviction of appellant who had worn "Kourts Kops Krooks" shirt in courtroom while quietly observing proceedings (internal quotation marks omitted)), appeal denied, 469 Mich. 988, 673 N.W.2d 756 (2003); *Smith* v. *Pace*, 313 S.W.3d 124, 126–27, 137 (Mo. 2010) (concluding that there was no interference or imminent threat of interference with administration of justice when lawyer defendant used "strong words . . . in petitioning the court . . . for a writ seeking to quash a subpoena" and therein accused judge and prosecutor of "misconduct" and "impropriety" (internal quotation marks omitted)). These cases demonstrate the types of speech that are protected and stand in stark contrast to Jones' speech in this case.

In applying this precedent to the speech at issue in the present case, we first observe that the trial court did not expressly consider whether the speech posed an imminent and likely threat to the administration of justice in ruling on the motions for sanctions.[21] The trial court instead found its authority to sanction under the court's inherent authority "to address out-of-court, bad faith litigation misconduct where there is a claim that a party harassed or threatened or sought to intimidate counsel on the other side" and noted its "obligation to ensure the integrity of the judicial process and [the] functioning of the court." Nevertheless, the findings that led

the trial court to sanction the defendants are consistent with our aforementioned standard. Specifically, the trial court found that, on the June 14, 2019 broadcast, Jones (1) accused opposing counsel of a felony ("planting child pornography"), (2) used threatening language toward opposing counsel through violent rhetoric, and (3) harassed and intimidated opposing counsel, calling him "a bitch, a sweet little cupcake, a sack of filth," and declaring war on him. It is obvious that the central reason why Jones' speech was censured and why it ultimately could pose a threat to the administration of justice is its genuine potential to influence the fairness of the proceedings. Specifically, Jones' broadcast produced additional threats to those involved in the case and created a hostile atmosphere that could discourage individuals from participating in the litigation.

Balancing the risk of fairness to the proceedings with "the need for free and unfettered expression," as required by *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. 843, does not render Jones' speech immune to sanctions under the first amendment, and we reject the defendants' assertion that "there is no barrier to a litigant, especially a litigant who is a broadcaster, speaking freely about pending litigation. [Jones'] decision to air his grievances over the airwaves and online is hardly remarkable. These media constitute the new public square." Although we recognize and reaffirm the importance of robust public comment about the court system and the judicial process, and acknowledge that, outside of litigation, Jones' speech may be protected,[22] the trial court's duty to ensure a fair trial for those appearing before it permits some restrictions on harassing and threatening speech toward participants in the litigation. Without the ability to place such restrictions, trial courts will be left defenseless to stop both actual interference and perceived threats to just adjudications. " 'Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice.' *Pennekamp* v. *Florida*, [supra, 328 U.S. 347]. But it must not be allowed to divert the trial from the 'very purpose of a court system . . . to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures.' " *Sheppard* v. *Maxwell*, supra, 384 U.S. 350–51.

Regardless of whether enforcement comes in the form of civil or criminal penalties, speech that interferes with the administration of justice cannot be tolerated. In *State* v. *Taupier*, 330 Conn. 149, 193 A.3d 1 (2018), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019), this court considered a first amendment challenge to a defendant's conviction of threatening in the first degree for an e-mail communication concerning a Superior Court judge. Id., 153–54. In that case, the defendant had "made it clear that he was extremely angry at the 'court,' over which [the judge] had presided,

that he had discovered where [the judge] lived, that he had surveilled [the judge's] residence, that he had thought through a very detailed and specific way to kill [the judge] at that location, and that he had anticipated being punished for his conduct." Id., 191. The court concluded that the speech was a true threat and, therefore, was unprotected. Id., 199. This conclusion was, in part, implicitly supported by the effect such speech had on the administration of justice, i.e., threatening violence against the judge presiding over the defendant's family court proceedings. See id., 184 (pointing to judge's reaction, defendant's history with family court system, and defendant and judge's past history as evidence supporting conviction). Such a threat, at the very least, could require the judge to recuse herself from the defendant's cases and, as such, interferes with a fair adjudication.

There are two important distinctions between *Bridges* and its progeny, on the one hand, and the present case, on the other, that lead us to conclude that Jones' broadcast posed an imminent and likely threat to the administration of justice. The first is Jones' role as a party in the litigation and the second is the unmistakably threatening and vituperative nature of the speech at issue. Both of these factors influence the imminence and likelihood of the threatened harm. In both *Wood* and *Bridges*, the statements were made by nonparties criticizing judicial action. In the present case, Jones is a party commenting on his own litigation and, therefore, has a greater opportunity and perceived incentive to affect the outcome of the case.[23] As a party to a judicial proceeding, Jones is participating in a government function and therefore is under the court's jurisdiction. For this reason, the trial court may sanction him for speech that, when made by a stranger to the litigation, may be acceptable.[24]

The second difference between the present case and *Bridges* and *Woods* is the nature of the intimidating and threatening speech, which demonstrates the coercive influence that might reasonably be expected as a result of Jones' broadcast. "Since we are committed to a government of laws and not of men, it is of the utmost importance that the administration of justice be absolutely fair and orderly. [The United States Supreme Court] has recognized that the unhindered and untrammeled functioning of our courts is part of the very foundation of our constitutional democracy." *Cox* v. *Louisiana*, 379 U.S. 559, 562, 85 S. Ct. 476, 13 L. Ed. 2d 487 (1965). "Courts must have [the] power to protect the interests of . . . litigants before them from unseemly efforts to pervert judicial action." *Pennekamp* v. *Florida*, supra, 328 U.S. 347. The record in this case reflects additional threats targeting those involved in the case in connection with Jones' speech.[25] In an order dated June 21, 2019, the trial court stated: "In the interest of full disclosure to all parties, the court was contacted

by the Connecticut State Police, [which was] reportedly contacted by the FBI regarding threats against the undersigned [judge] made by individuals on the . . . Infowars website."[26] In addition, the plaintiffs' counsel also represented to the trial court that, as a result of the broadcast, they had "since received threats from the outside" and even obtained police protection when attending the court hearing after the broadcast. We take seriously these statements on the record because "[i]t long has been the practice that a trial court may rely [on] certain representations made to it by attorneys, who are officers of the court and bound to make truthful statements of fact or law to the court." (Internal quotation marks omitted.) *State* v. *Chambers*, 296 Conn. 397, 419, 994 A.2d 1248 (2010).

Jones' speech further was calculated to interfere with the fairness of the proceedings as it directly targeted opposing counsel, accusing him of felonious behavior and threatening him, and reasonably can be expected to influence how the plaintiffs litigate their case.[27] On the broadcast, Jones declared war on those who planted the child pornography, implicated the plaintiffs' counsel, and promoted a million dollar bounty. Jones stated: "You're trying to set me up with child porn. I'm going to get your ass. One million dollars. One million dollars, you little gang members. One million dollars to put your head on a pike. One million dollars, bitch. I'm going to get your ass." A party who places a one million dollar bounty on the head of opposing counsel, whether literally or figuratively in the form of his conviction, undeniably interferes with the proceedings. This speech clearly " 'is directed to inciting or producing' a threat to the administration of justice that is both 'imminent' and 'likely' to materialize." *Turney* v. *Pugh*, supra, 400 F.3d 1202. Harassing and intimidating counsel so that they withdraw from litigating a case is beyond cavil; it is an unfair and inappropriate litigation strategy that strikes at the core of our system.[28] See *Harry* v. *Lagomarsine*, Docket No. 18-CV-1822 (BMC) (LB), 2019 WL 1177718, *3 (E.D.N.Y. March 13, 2019) (explaining how threats to opposing counsel "effected a permanent change in [the] defendants' representation"); *Kalwasinski* v. *Ryan*, supra, 2007 WL 2743434, *3 ("[b]y deliberately and intentionally participating in making threats of physical harm against parties and witnesses in his case, he has engaged in conduct that he should have known would threaten a fair decision in this matter"). We recognize that there is a place for strong advocacy in litigation, but language evoking threats of physical harm is not tolerable. In light of these reasons, we conclude that Jones' speech could pose a threat to the plaintiffs' ability to litigate their case, rendering it an imminent and likely threat to the administration of justice.

Finally, we consider whether the state's interests may be served in another manner and whether the sanctions imposed are narrowly tailored to the state's interest in

ensuring fair judicial proceedings. See, e.g., *Gentile* v. *State Bar of Nevada*, supra, 501 U.S. 1076; *Landmark Communications, Inc.* v. *Virginia*, supra, 435 U.S. 843. The trial court penalized the defendants in a restrained manner in order to preserve the judicial process. In this case, the trial court might have issued a gag order, but such a measure could improperly penalize future speech in the form of a prior restraint. See, e.g., *Kemner* v. *Monsanto Co.*, 112 Ill. 2d 223, 249–50, 492 N.E.2d 1327 (1986) (noting that there are less restrictive means than a gag order "to preserve the integrity of the proceedings before it," such as contempt). Instead, the court appropriately dealt with two issues in a proportional sanction that was more measured than the individual punishments of civil or criminal contempt that have been upheld as a consequence for similar conduct. Indeed, the court refrained from imposing the more severe sanction requested by the plaintiffs, specifically, defaulting the defendant. The court selected a lower penalty, namely, the revocation of special statutory benefit, because the defendants abused the process set out in the statute through their discovery practices. Accordingly, we conclude that the trial court did not violate the first amendment when it imposed sanctions on the basis of Jones' broadcast, which presented an imminent and likely threat to the administration of justice.[29]

B

We next consider whether the trial court abused its discretion by sanctioning the defendants for their discovery abuses and Jones' broadcast. A trial court's power to sanction a litigant or counsel stems from two different sources of authority, its inherent powers and the rules of practice. *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 9–10, 776 A.2d 1115 (2001) ("One source of the trial court's authority to impose sanctions is the court's inherent power. . . . In addition, our rules of practice, adopted by the judges of the Superior Court in the exercise of their inherent rule-making authority . . . also [provide] for specific instances in which a trial court may impose sanctions." (Citations omitted; footnote omitted.)); see *Chambers* v. *NASCO, Inc.*, supra, 501 U.S. 50–51 (discussing relationship between sanctions under Federal Rules of Civil Procedure and court's inherent power). As discussed previously, this inherent authority permits sanctions for "dilatory, bad faith and harassing litigation conduct . . . ." (Internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 393. Additionally, under Practice Book § 13-14, a court may sanction a party for noncompliance with the court's discovery orders. Among the permissible sanctions is foreclosing judgment on the merits for a party, such as by rendering a default judgment against a defendant or by dismissing a plaintiff's case. See Practice Book § 13-14 (b). The anti-SLAPP statute does not limit the court's authority to impose sanctions. See General Statutes § 52-196a (h)

(2).

In reviewing the portion of the sanctions based on the violation of discovery orders, we consider three factors. "First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review. Third, the sanction imposed must be proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 17–18. "The determinative question for an appellate court is not whether it would have imposed a similar sanction but whether the trial court could reasonably conclude as it did given the facts presented. Never will the case on appeal look as it does to a [trial court] . . . faced with the need to impose reasonable bounds and order on discovery." (Internal quotation marks omitted.) *Usowski* v. *Jacobson*, 267 Conn. 73, 85, 836 A.2d 1167 (2003). "Trial court judges face great difficulties in controlling discovery procedures which all too often are abused by one side or the other and this court should support the trial judges' reasonable use of sanctions to control discovery." (Internal quotation marks omitted.) *Mulrooney* v. *Wambolt*, 215 Conn. 211, 223, 575 A.2d 996 (1990).

In its oral decision granting the motions for sanctions, the trial court observed that "the discovery in this case has been marked with obfuscation and delay on the part of the defendants . . . ." The court cited two specific examples of discovery noncompliance: (1) the defendants failed to produce adequate Google Analytics information with respect to marketing data and to conduct a complete search of Jones' cell phone, and (2) the defendants "disregarded" discovery deadlines on multiple occasions, "continue[d] to object to . . . discovery, and failed to produce that which is within their knowledge, possession, or power to obtain."

It is undisputed that the trial court's discovery orders were reasonably clear and that the defendants violated four of them.[30] The defendants do not raise distinct arguments under the first two prongs of *Millbrook Owner's Assn.*, *Inc.*, but, instead, largely challenge the "harshness" of the sanctions imposed. In considering whether the sanction revoking the defendants' opportunity to pursue the special motions to dismiss was proportional to the defendants' discovery violations, we are guided by "the factors we previously have employed when review-

ing the reasonableness of a trial court's imposition of sanctions: (1) the cause of the [party's] failure to respond to the posed questions, that is, whether it is due to inability rather than the [wilfulness], bad faith or fault of the [party] . . . (2) the degree of prejudice suffered by the opposing party, which in turn may depend on the importance of the information requested to that party's case; and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Internal quotation marks omitted.) *Yeager* v. *Alvarez*, 302 Conn. 772, 787, 31 A.3d 794 (2011). We also consider how Jones' broadcast impacted the trial court's decision sanctioning the defendants for bad faith litigation practices. See *MacCalla* v. *American Medical Response of Connecticut, Inc.*, 188 Conn. App. 228, 230, 239, 204 A.3d 753 (2019) (upholding sanction of dismissal on basis of plaintiffs' noncompliance with discovery orders and "the unprofessional and dilatory conduct of the plaintiffs' counsel," who called "a party's corporate representative [who was] attending a deposition a trespasser," and holding that this conduct "evinces a disregard for the provisions of the Practice Book and the authority of the court").

The plaintiffs argue that the sanctions are proportional because the defendants' violations were "deliberate," "wilful," and in "bad faith . . . ." The defendants counter that their actions were not taken in bad faith. "[I]n assessing proportionality, a trial court must consider the totality of the circumstances, including, most importantly, the nature of the conduct itself." *Ridgaway* v. *Mount Vernon Fire Ins. Co.*, 328 Conn. 60, 76, 176 A.3d 1167 (2018); see also *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16 ("dismissal of an action is not an abuse of discretion where a party shows a deliberate, contumacious or unwarranted disregard for the court's authority" (internal quotation marks omitted)). In the present case, the trial court did not expressly find that the defendants' discovery abuses were performed in bad faith but, in its oral decision, pointedly characterized their actions as being marked by a pattern of "obfuscation and delay . . . ." Additionally, the record supports the trial court's finding that the defendants repeatedly ignored court deadlines and continued to challenge the underlying merits of discovery, even after the court found the requisite good cause to allow discovery under § 52-196a (d).[31] See, e.g., *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (upholding dismissal of action in light of "[the] respondents' 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities" when respondents failed to answer written interrogatories by deadline). Accordingly, we conclude that the record supports the trial court's finding that the defendants wilfully disregarded the court's discovery orders.

This wilful disregard was exacerbated by Jones' con-

duct during the June 14, 2019 broadcast. The trial court found that Jones' actions were "indefensible, unconscionable, despicable, and possibly criminal," and that the "deliberate tirade and harassment and intimidation against Attorney Mattei and his firm [were] unacceptable and sanctionable." Because Jones' statements were one part of a whole picture of bad faith litigation misconduct, we conclude that the trial court's reliance on Jones' speech as part of the rationale for the sanctions orders was appropriate in this context.

With respect to the defendants' ability to comply with discovery, one mitigating factor that potentially could have explained the defendants' noncompliance with the discovery deadlines was their change in counsel midway through the discovery process. Although the parties disagree as to whether this change in counsel was a "strategic" tactic, the record indicates that, even under the defendants' original counsel, the documents were still far from ready for production.[32] Moreover, the record supports the trial court's determination that the change in counsel did not by itself affect the defendants' ability to produce the discovery on time.[33]

Turning to the prejudice factor, we consider the importance of the undisclosed discovery material, the effect the information would have on the party requesting it, and whether the information was available through other means. *Yeager* v. *Alvarez*, supra, 302 Conn. 787–88; see id., 789–90 (defendants were not prejudiced by noncompliance when materials that they sought had been indirectly included in plaintiffs' production). In the present case, the record supports the trial court's implicit finding that the defendants' noncompliance was prejudicial to the plaintiffs[34] because, each time the defendants did not comply with the court ordered discovery, the plaintiffs were unable to access information that could assist them in proving probable cause that they would succeed on the merits of their complaints. For example, access to the defendants' marketing data would be relevant to proving a financial connection between the defendants' actions and the statements made during the broadcast.[35] See *Krahel* v. *Czoch*, 186 Conn. App. 22, 35–36, 198 A.3d 103 (considering importance of unproduced discovery and its effect on plaintiff's case when analyzing prejudice), cert. denied, 330 Conn. 958, 198 A.3d 584 (2018).

Finally, we consider the proportionality of the specific sanction employed to the violations at issue. Here, the trial court was not just considering one violation of a court deadline but several, and, therefore, the defendants' noncompliance warranted an appropriate sanction by that court. See *Emerick* v. *Glastonbury*, 177 Conn. App. 701, 736–37, 173 A.3d 701 (2017) ("The plaintiff's conduct, considered in its entirety, satisfied this standard. . . . The court's repeated warnings, suggestions and fines had no impact on the plaintiff, as he

ignored the court's admonitions and continued to delay the trial." (Citation omitted.)), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018). These violations, when considered together, reasonably could be found to make up a pattern of wilfulness on the part of the defendants. But cf. *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 681, 72 A.3d 1019 (2013) (reversing sanction of dismissal because "the objectionable conduct at issue was an isolated event and was not one in a series of actions in disregard of the court's authority"); *Usowski* v. *Jacobson*, supra, 267 Conn. 93 (trial court abused its discretion in sanctioning party by dismissing action on ground that "the record does not establish that the failure to comply with the discovery orders constituted a continuing pattern of violations" because "other factors of a mitigating nature also were present"). The trial court considered this wilfulness along with the defendants' harassing and intimidating speech toward the plaintiffs' counsel, which together created a whole spectrum of bad faith litigation misconduct. "As is often the case in life . . . the whole of abusive action is greater than the sum of the parts of which it is made. Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice . . . ." *Fuery* v. *Chicago*, 900 F.3d 450, 454 (7th Cir. 2018). "[I]t is the [trial] court [that] can evaluate the whole ball of wax and determine whether the small incremental blows to the integrity of the trial add up to something that requires sanctioning. Death by a thousand cuts is no less severe than death by a single powerful blow." Id., 464.

Although the sanctions imposed by the trial court are not the sanctions enumerated within the rules of practice, this does not mean they were disproportionate or impermissible as a matter of law. For example, in *Yeager* v. *Alvarez*, supra, 302 Conn. 772, we concluded that a trial court had the authority to "strike an otherwise valid offer of compromise" as a sanction for a discovery violation; id., 778; because it "falls well within the ambit of judicial power contemplated by both the court's inherent authority and the rules of practice. Significantly, [Practice Book § 13-14 (a)] authorizes a trial court to penalize discovery violations by entering orders 'as the ends of justice require.' In fact, § 13-14 (b) contains sanctions even more severe than those imposed in this matter. These severe sanctions, which may strip a party of all prospect of prevailing, logically encompass a host of lesser penalties. Such milder sanctions may include orders that reduce a party's likelihood of success at trial . . . ." Id., 781.

The sanctions imposed by the trial court in the present case revoked a statutory benefit, namely, the opportunity to pursue the special motions to dismiss under § 52-196a (d), which further penalized the defendants by rescinding a stay of the full discovery process. None-

theless, as the trial court found, this was a measured sanction for the defendants' noncompliance with limited discovery, which was an abuse of the very benefit they sought to utilize. Moreover, the sanctions imposed were well short of a default or dismissal, insofar as they do not preclude the defendants from having the merits of their cases adjudicated in a conventional manner, such as by summary judgment or trial. See *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 16 ("the court's discretion should be exercised mindful of the 'policy preference to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his day in court' "); cf. *Emerick* v. *Glastonbury*, supra, 177 Conn. App. 737 (upholding sanction of dismissal when plaintiff engaged in "continuing and deliberate misconduct . . . [that] demonstrated . . . deliberate disregard for the court's orders").

In assessing the proportionality of the sanctions, we next turn to the defendants' central argument for excusing their noncompliance, namely, that the discovery in this case was overbroad and that the sanctions, therefore, were not appropriate. According to the defendants, "[w]hen discovery is allowed under § 52-196a, it is allowed as an exception to the statutory rule that discovery is to be stayed pending a decision on the special motion to dismiss, and—when allowed—it must be specific and limited. But, without any clarity from the court as to how the specific and limited discovery should proceed, the plaintiffs exploited the untended frontiers of the judge's order until the specific and limited discovery ordered by the court was indistinguishable from the broad contours of general discovery in all civil cases . . . ." (Emphasis omitted; footnote omitted.)

First, notwithstanding the merits of the defendants' breadth argument, the plaintiffs correctly point out that, despite the defendants' grievances with the scope of discovery, the defendants are still required to comply with the court's orders. "[A] party has a duty to obey a court order even if the order is later held to have been unwarranted." *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 658 n.20, 646 A.2d 133 (1994); see also *Mulholland* v. *Mulholland*, 229 Conn. 643, 649, 643 A.2d 246 (1994). "An order of the court must be obeyed until it has been modified or successfully challenged, and the consequences for noncompliance may be severe indeed." *Fox* v. *First Bank*, 198 Conn. 34, 40 n.3, 501 A.2d 747 (1985).

Second, nothing in the anti-SLAPP statute limits the trial court's discretion to order "specified and limited discovery relevant to the special motion to dismiss" beyond the "good cause" standard set forth in § 52-196a (d).[36] We will not fill this legislative silence by imposing broad restrictions on the trial court's discretion to determine good cause, insofar as each case will present dif-

ferent claims and defenses bearing on whether limited discovery should be granted. Cf. *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 57, 459 A.2d 503 (1983) ("[t]he granting or denial of a discovery request rests in the sound discretion of the court"); *Coss* v. *Steward*, 126 Conn. App. 30, 46–47, 10 A.3d 539 (2011) (discussing good cause requirement for protective orders and trial court's discretion in granting them). We conclude, therefore, that the defendants' claims that discovery was improvidently granted under the anti-SLAPP statute does not excuse their failure to comply with the trial court's orders. Accordingly, the trial court did not abuse its discretion in sanctioning the defendants for discovery violations and Jones' June 14, 2019 broadcast.

II

The final issue in this appeal is whether the defendants were afforded adequate notice and a meaningful opportunity to respond before the trial court imposed sanctions. The defendants argue that the court ordered sanctions in an overly summary process because, on Monday, June 17, 2019, the plaintiffs filed their motion requesting court review of the broadcast, along with expedited briefing on "what orders must issue in connection with [Jones'] on-air statements," and indicated they would move for "specific relief on an expedited basis," and, the very next day, the court ruled on the merits of the plaintiffs' motion for sanctions without any briefing by the defendants. Additionally, the defendants argue that the court handed their attorney a copy of a recent judicial decision the court considered instructive; see *Maurice* v. *Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. 21; and gave the defendants' counsel only the lunch hour to prepare for argument on whether the trial court should order sanctions. The plaintiffs counter that the defendants were afforded sufficient due process because the trial court repeatedly had warned them that it would revoke the opportunity to pursue the special motions to dismiss. They also point out that a June 17, 2019 court order notified counsel that they should be prepared to discuss the broadcast at the hearing scheduled for the following day. Finally, the plaintiffs argue that the defendants did not at any point indicate to the court that they needed additional time to prepare. We agree with the plaintiffs and conclude that the trial court's sanctions did not violate the defendants' due process rights.

"At their core, the due process clauses of the state and federal constitutions require that one subject to a significant deprivation of liberty or property must be accorded adequate notice and a meaningful opportunity to be heard." *Council on Probate Judicial Conduct re James H. Kinsella*, 193 Conn. 180, 207, 476 A.2d 1041 (1984); see *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 239 Conn. 393 ("As a procedural matter, before

imposing . . . sanctions, the court must afford the sanctioned party or attorney a proper hearing on the . . . motion for sanctions. . . . There must be fair notice and an opportunity for a hearing on the record." (Citation omitted; internal quotation marks omitted.)). "Whether the defendant was deprived of his due process rights is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 500, 970 A.2d 570 (2009).

Having reviewed the record, we conclude that the defendants received adequate notice so as to be apprised of the possibility of sanctions entering as a result of their conduct.[37] Specifically, the plaintiffs filed a motion seeking sanctions several months earlier because of the defendants' discovery noncompliance. The trial court discussed the possibility of sanctioning the defendants on several occasions and had reissued this warning in its order on June 10, 2019, regarding the outstanding Google Analytics material. The day before the hearing, the plaintiffs indicated that they would seek interim relief, and the court issued an order stating that it would address the broadcast at the hearing. Because of the trial court's countless warnings that it would sanction the defendants in this specific manner, the defendants cannot reasonably contest that they were not adequately notified of the possibility of such sanctions. Cf. *Fattibene* v. *Kealey*, 18 Conn. App. 344, 350, 353–54, 558 A.2d 677 (1989) (reversing sanctions order when trial court ruled on motion for sanctions without first considering plaintiff's objection). In addition, the trial court held a hearing, at which it heard thorough argument on the issue, and at no point during the argument did the defendants request additional time.[38] This satisfies the due process requirement for a meaningful opportunity to be heard. See, e.g., *Thalheim* v. *Greenwich*, 256 Conn. 628, 650–51, 775 A.2d 947 (2001) (concluding that sanctioned attorney had been afforded "adequate notice and a meaningful opportunity to be heard" when trial court issued order requesting that he "show cause why [he] should not be sanctioned" and attorney received hearing (internal quotation marks omitted)).

The sanctions orders are affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins, Kahn and Ecker. Although Justice Palmer was not present when the case was argued before the court, he has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

** July 23, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The plaintiffs are Erica Lafferty, David Wheeler, Francine Wheeler, Jacqueline Barden, Mark Barden, Nicole Hockley, Ian Hockley, Jennifer Hensel, Jeremy Richman, Donna Soto, Carlee Soto-Parisi, Carlos M. Soto, Jillian Soto, and William Aldenberg.

[2] The defendants participating in this appeal are Jones and several of his affiliated corporate entities, namely, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC, and Prison Planet TV, LLC. We refer to these parties collectively as the defendants and, when necessary, individually by name.

The additional defendants named in the complaint, Wolfgang Halbig, Cory T. Sklanka, Genesis Communications Network, Inc., and Midas Resources, Inc., are not parties to this appeal.

[3] The defendants appeal pursuant to the Chief Justice's grant of their petition to file an expedited public interest appeal pursuant to General Statutes § 52-265a. A sanctions order for discovery violations generally is considered interlocutory and is not appealable until a party is held in contempt for noncompliance. *Incardona* v. *Roer*, 309 Conn. 754, 760, 73 A.3d 686 (2013). We have appellate jurisdiction, however, because it is well established that "appeals from interlocutory orders may be taken pursuant to § 52-265a." *Foley* v. *State Elections Enforcement Commission*, 297 Conn. 764, 767 n.2, 2 A.3d 823 (2010).

[4] SLAPP is an acronym for "strategic lawsuit against public participation," the "distinctive elements of [which] are (1) a civil complaint (2) filed against a nongovernment individual (3) because of their communications to government bodies (4) that involves a substantive issue of some public concern. . . . The purpose of a SLAPP suit is to punish and intimidate citizens who petition state agencies and have the ultimate effect of chilling any such action." (Citation omitted; internal quotation marks omitted.) *Field* v. *Kearns*, 43 Conn. App. 265, 275–76, 682 A.2d 148, cert. denied, 239 Conn. 942, 684 A.2d 711 (1996).

[5] General Statutes § 52-196a provides in relevant part: "(b) In any civil action in which a party files a complaint, counterclaim or cross claim against an opposing party that is based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint, counterclaim or cross claim.

"(c) Any party filing a special motion to dismiss shall file such motion not later than thirty days after the date of return of the complaint, or the filing of a counterclaim or cross claim described in subsection (b) of this section. The court, upon a showing of good cause by a party seeking to file a special motion to dismiss, may extend the time to file a special motion to dismiss.

"(d) The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. Notwithstanding the entry of an order to stay discovery, the court, upon motion of a party and a showing of good cause, or upon its own motion, may order specified and limited discovery relevant to the special motion to dismiss.

"(e) (1) The court shall conduct an expedited hearing on a special motion to dismiss. . . . (2) When ruling on a special motion to dismiss, the court shall consider pleadings and supporting and opposing affidavits of the parties attesting to the facts upon which liability or a defense, as the case may be, is based. (3) The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, unless the party that brought the complaint, counterclaim or cross claim sets forth with particularity the circumstances giving rise to the complaint, counterclaim or cross claim and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint, counterclaim or cross claim. (4) The court shall rule on a special motion to dismiss as soon as practicable.

"(f) (1) If the court grants a special motion to dismiss under this section, the court shall award the moving party costs and reasonable attorney's fees, including such costs and fees incurred in connection with the filing of the special motion to dismiss. (2) If the court denies a special motion to dismiss under this section and finds that such special motion to dismiss is frivolous and solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to the party opposing such special motion to dismiss.

"(g) The findings or determinations made pursuant to subsections (e) and (f) of this section shall not be admitted into evidence at any later stage of the proceeding or in any subsequent action. . . ."

[6] Similar interrogatories and requests for production, with small variations in number and language, were made to Cory T. Sklanka, Wolfgang Halbig, Free Speech Systems, LLC, Infowars Health, LLC, Infowars, LLC, Prison Planet TV, LLC, Midas Resources, Inc., and Genesis Communications Network, Inc. In addition, the plaintiffs noticed the individual depositions of Jones, Sklanka, Halbig, Kurt Nimmo, the former editor of Infowars, LLC, and Steve Pieczenik, a guest on Jones' radio show who had expressed that the Sandy Hook shooting was a hoax, as well as the corporate designees of Free Speech Systems, LLC, Genesis Communications Network, Inc., Infowars Health, LLC, Infowars, LLC, Midas Resources, Inc., and Prison Planet TV, LLC.

[7] The defendants filed motions for an extension of time on February 22, 2019, the day before production was due. It does not appear that the trial court decided those motions.

[8] Practice Book § 13-14 provides in relevant part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production or for disclosure of the existence and contents of an insurance policy or the limits thereof, or has failed to submit to a physical or mental examination, or has failed to comply with a discovery order made pursuant to Section 13-13, or has failed to comply with the provisions of Section 13-15, or has failed to appear and testify at a deposition duly noticed pursuant to this chapter, or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following: (1) The entry of a nonsuit or default against the party failing to comply . . . [and] (5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal. . . ."

[9] The defendants and the plaintiffs both included transcripts of the June 14, 2019 broadcast in their appendices filed with this court. Their transcripts do not differ materially with respect to the language quoted in this opinion except for one phrase. The defendants' transcript uses the phrase "white shoe boy," whereas the plaintiffs' transcript uses the phrase "white Jew boy . . . ." The trial court, in its oral decision ordering sanctions, relied on the plaintiffs' transcript containing the phrase "white Jew boy . . . ." The defendants subsequently filed a motion to correct the transcript, which the trial court did not decide.

In their appellate briefs, the defendants noted the inconsistencies between the two transcripts and that the trial court had not ruled on their motion to correct, but they do not specifically challenge the accuracy of this phrase on appeal. As the trial court did not decide the motion to correct, we omit the words "Jew" and "shoe" in the quoted transcript.

The transcripts of the broadcast each exceed thirty pages, so we have not reproduced them in their entirety. We include only those portions relied on by the trial court, supplemented when necessary for context. Specifically, we have omitted those portions in which Jones discusses the case's background and the details of the child pornography incident, Jones' introduction of Pattis, Jones' critique of the plaintiffs' case and the Google Analytics reports, discussion of the first amendment ramifications of questioning the veracity of the Sandy Hook shooting, most of Pattis' statements, and other duplicative or irrelevant portions of the broadcast.

[10] The defendants' transcript provides: "Look. You're showing Chris Mattei's photograph on the air."

[11] The defendants' transcript provides: "No, I'm sure—you don't think errand boy did this. I'm actually not saying that."

[12] The trial court also indicated that it would award attorney's fees related to the child pornography issue at a later date, "upon further hearing and the filing of affidavits . . . ."

[13] The trial court also stated: "Now, the transcript doesn't reflect this, but, when I listened to the broadcast, I heard, I'm going to kill. Now, that's not in the transcript, but that is my read and understanding, and what I heard [o]n the broadcast." Because the word "kill" is not mentioned in the transcripts, we do not consider it in our analysis of the trial court's sanctions orders.

[14] The defendants incorrectly state that the sanctioned party in *Maurice v. Chester Housing Associates Ltd. Partnership*, supra, 188 Conn. App. 21, did not challenge the sanction on first amendment grounds. Instead, the Appellate Court declined to reach the issue, deeming the courthouse a nonpublic forum. Id., 33 n.11.

[15] These first amendment implications, however, often are not raised or deeply considered. For example, in *Carroll* v. *Jaques Admiralty Law Firm, P.C.*, supra, 110 F.3d 294, the court succinctly concluded, without substantive discussion, that the sanction imposed did not violate the affected party's first amendment rights. But see *In re White*, Docket No. 2:07CV342, 2013 WL 5295652, *38 (E.D. Va. September 13, 2013) ("[w]here government action, such as an award of sanctions, is directed toward presumptively protected expression, our system of justice places 'the duty . . . on this [c]ourt to say where the individual's freedom ends and the [s]tate's power begins' ").

[16] Contempt cases are instructive because the power to sanction and the power to hold an individual in contempt both stem from the court's inherent authority. See, e.g., *Jaconski* v. *AMF, Inc.*, 208 Conn. 230, 232–33, 543 A.2d 728 (1988); 17 Am. Jur. 2d 399, Contempt § 1 (2004).

[17] The importance of the legality of the action at issue is demonstrated by the fact that the United States Supreme Court mentioned it twice. See *Bridges* v. *California*, supra, 314 U.S. 277 ("[o]n no construction, therefore, can the telegram be taken as a threat either by [the defendant] or the union to follow an illegal course of action"); id., 278 ("[l]et us assume that the telegram could be construed as an announcement of [the defendant's] intention to call a strike, something which, it is admitted, neither the general law of California nor the court's decree prohibited").

[18] Actual interference might be construed as an additional factor under the clear and present danger test. See *Wood* v. *Georgia*, supra, 370 U.S. 399 (Harlan, J., dissenting). Read in context, however, *Wood* suggests that the court's search for actual interference likely stems from the facts of *Wood* rather than a substantive alteration to the *Bridges* standard, as the court stated: "[I]n the absence of any showing of an actual interference with the undertakings of the grand jury, *this record lacks persuasion in illustrating the serious degree of harm to the administration of law* . . . ." (Emphasis added.) Id., 393. Indeed, the court specifically observed that the harm that speech could cause to a grand jury investigation is different from that of a trial. See id., 390 ("the limitations on free speech assume a different proportion when expression is directed toward a trial as compared to a grand jury investigation"). Also, earlier cases construing this test required an analysis of imminence and likelihood, which is inconsistent with an actual interference requirement. See *Craig* v. *Harney*, supra, 331 U.S. 373, 376; *Pennekamp* v. *Florida*, 328 U.S. 331, 334, 350, 66 S. Ct. 1029, 90 L. Ed. 1295 (1946); *Bridges* v. *California*, supra, 314 U.S. 263. As a result, we interpret *Wood* in harmony with those cases that came before it and conclude that a showing of actual interference is but one factor in the clear and present danger analysis.

[19] The District Court also analyzed whether sanctions should enter under a strict scrutiny analysis. *In re White*, supra, 2013 WL 5295652, *71.

[20] Additionally, courts have applied *Bridges* to extrajudicial speech restrictions beyond contempt. For example, it was discussed recently by the Colorado Supreme Court in examining a jury tampering conviction. See *People* v. *Iannicelli*, 449 P.3d 387, 392–93 (Colo. 2019). Although the case ultimately was decided on grounds of statutory construction; see id., 394–97; the court recognized that "[s]peech concerning judicial proceedings is not without limits . . . because like free speech, a fair trial is one 'of the most cherished policies of our civilization' and must also be protected." Id., 392; see id., 396 n.3 ("[W]e acknowledge that defining the precise scope of [Colorado's jury tampering statute] presents complex questions as to both [f]irst [a]mendment rights and the [s]tate's interest in ensuring the fair and orderly administration of justice. The facts of this case, however, do not require us to attempt to craft an all-encompassing rule applicable in every factual scenario. Accordingly, we leave that difficult task for another day."); see also *United States* v. *Heicklen*, 858 F. Supp. 2d 256, 274 (S.D.N.Y. 2012) ("[t]he relevant cases establish that the [f]irst [a]mendment squarely protects speech concerning judicial proceedings and public debate regarding the functioning of the judicial system, so long as that speech does not interfere with the fair and impartial administration of justice").

[21] In their argument before the trial court, the defendants contended that the broadcast "did not disrupt the administration of justice."

[22] "Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these matters, not abridgment of the rights of free speech and assembly." *Wood* v. *Georgia*, supra, 370 U.S. 389.

[23] The defendants disagree and cite to *In re Sawyer*, 360 U.S. 622, 636, 79

S. Ct. 1376, 3 L. Ed. 2d 1473 (1959), for the proposition that the parties' speech cannot be "more censurable" than that of nonparties during the pendency of a court case. We disagree. *In re Sawyer* concerns an attorney, not a party, and supports the opposite view when quoted in context: "We can conceive no ground whereby the pendency of litigation might be thought to make an attorney's out-of-court remarks more censurable, *other than that they might tend to obstruct the administration of justice. Remarks made during the course of a trial might tend to such obstruction where remarks made afterwards would not.* But this distinction is foreign to this case, because the charges and findings in no way turn on an allegation of obstruction of justice, or of an attempt to obstruct justice, in a pending case." (Emphasis added.) Id.

[24] It is important to note that, although Jones is a defendant and therefore has not been willingly brought into the litigation, that status does not diminish the need for a fair trial, does not grant him license to harass and intimidate opposing counsel, and does not lessen the potential impact of his statements on the trial. However, not all speech by Jones regarding the case is sanctionable—only harassing and threatening speech that presents a likely and imminent threat to the administration of justice. See, e.g., M. Swartz, Note, "Trial Participant Speech Restrictions: Gagging First Amendment Rights," 90 Colum. L. Rev. 1411, 1421–22 (1990) (noting special concerns for criminal and civil defendants). This fact, along with the nature of civil proceedings as a whole, supports our use of the most stringent standard to analyze Jones' speech. See *Chicago Council of Lawyers* v. *Bauer*, supra, 522 F.2d 257–58 (noting how fair trial concerns are lessened in civil litigation).

[25] It is important to note that a judge may still sanction for threatening or intimidating speech in the absence of actual interference with the administration of justice, yet we consider these direct threats as aggravating circumstances in this particular case.

[26] It is unclear whether these threats against the trial judge stemmed from the original broadcast or a subsequent broadcast by Jones discussing the sanctions orders.

[27] The trial court specifically considered this when it questioned defense counsel about how Jones' speech affects the "integrity of the process here and the functioning of the court and the judicial process . . . ."

[28] In fact, the defendants implicitly recognized this interference, as they argued to the trial court that Attorney Mattei should not participate in the case if he feels threatened, stating: "[I]f you've got a former federal prosecutor in here who's saying, as a result of this, he can't do his job, then maybe you should get him off the case because he's not prepared to serve his clients." The defendants renewed this argument in their brief to this court, arguing: "If [Mattei] feels sufficiently chilled or impaired, he can, of course, seek to withdraw as counsel."

The defendants also argue that Jones, in a subsequent broadcast, "made clear he did not intend to threaten [Mattei]." The trial court interpreted this later broadcast as a classic nonapology, stating: "[W]hen I watched the broadcast several times, I wasn't able to see an apology in there. . . . It doesn't sound like an apology."

[29] The plaintiffs also argue that Jones' speech qualifies as a true threat unprotected by the first amendment. The defendants disagree with this assertion, arguing that the broadcast "was not unequivocal, unconditional, immediate and specific [so] as to convey a gravity of purpose and imminent prospect of execution." Additionally, the defendants argue that the trial court did not allow Jones the opportunity to present evidence to counter a true threat finding, distinguishing this case from *Haughwout* v. *Tordenti*, 332 Conn. 559, 211 A.3d 1 (2019). We initially note that, as the case currently stands, the record is not adequately developed to determine whether Jones' statements qualify as a true threat. But cf. id., 562 n.4 (trial court's decision was supported by facts from disciplinary proceeding and plaintiff's testimony). Because we have determined that Jones' speech constituted an imminent and likely threat to the administration of justice, we need not reach the issue of whether Jones' speech also qualifies under a different category of unprotected speech as a matter of law.

[30] The defendants purport to dispute these issues in their brief by stating, in a heading, that "[t]he court sanctioned [them] for violating the discovery process . . . despite the lack of sufficiently clear orders or actual violations." Despite mentioning this in the heading, there is no clear argument in the brief to support this argument. Instead, the defendants' discovery argument basically contests the merits and breadth of the discovery permitted by the trial court. As a result, we construe the first two prongs of

*Millbrook Owners' Assn., Inc.* v. *Hamilton Standard*, supra, 257 Conn. 17–18, as undisputed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Citation omitted; internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016).

[31] For example, even after the trial court ordered the defendants to produce the Google Analytics materials on June 10, 2019, the defendants continued to contest whether they should be ordered to produce the data.

[32] At a March 22, 2019 hearing, Attorney Pattis stated: "I was given those documents on or about March 6. I was also given some interrogatory responses on March 6. Those interrogatory responses were not satisfactory to my way of thinking."

[33] At the March 22, 2019 hearing, the court explained: "I think part of the problem is that your clients are maybe tying their own lawyers' hands by getting other lawyers involved so that nobody knows what anyone else is doing. That would be the most favorable light. . . . The least favorable light would be manipulation."

[34] At an April 3, 2019 hearing, the plaintiffs' counsel cited "delay after delay after delay by a party [who] . . . invoked the statute but [who] wasn't prepared to comply with its provisions, [which] is prejudicing my clients."

[35] The plaintiffs' counsel argued that the Google Analytics would show "[s]ales, pricing, web traffic, that is, hits on the website and hits on the Infowars store website." He further argued that "Infowars [LLC] and Free Speech Systems [LLC] [generate] millions and millions and millions of dollars of revenue each year. The content that they broadcast, including the content about Sandy Hook, they use to drive traffic to their website. That's why we're entitled to this stuff."

[36] Although the legislative history of the anti-SLAPP statute does not further illuminate the meaning of the phrase "good cause," as used in § 52-196a (d), we find the purpose of the statute instructive. Speaking in support of the bill later enacted as § 52-196a, then Representative William Tong explained that it was intended to address "situations in which people have spoken out on matters of public concern including the press and we've seen situations where people file litigation. There appears to be no basis to that litigation but it's designed to chill free speech and the expression of constitutional rights, and so this provides for a special motion to dismiss so that early in the process somebody who's speaking and exercised their constitutional rights can try to dismiss a frivolous or abusive claim that has no merit and short circuit a litigation where it might otherwise cost a great deal of money to continue to prosecute. We think it's an important measure . . . to promote free speech and reporting by our news organizations as well." 60 H.R. Proc., Pt. 16, 2017 Sess., pp. 6879–80; see also footnote 4 of this opinion.

[37] The defendants rely on *New Hartford* v. *Connecticut Resources Recovery Authority*, supra, 291 Conn. 489, to support their claim of a due process violation. In that case, we held that the defendants were not afforded sufficient due process after a trial court found them in contempt. Id., 491. The present case, however, is distinguishable because, in *New Hartford*, the defendants indicated at the hearing that they were unprepared to address the violation of the gag order. Id., 494–95. In addition, "[t]he defendant was given less than one day to consider a motion for contempt," and "[t]he defendant's attorney stated that he had not read the full text of the posting, that he had not been able to speak to the persons responsible for the website posting or anyone else and that he would like to speak to them about why they had posted the article." Id., 501. In contrast, unlike the attorney in *New Hartford*, Attorney Pattis was present on the broadcast, witnessed Jones' allegedly sanctionable conduct, and made representations to the court on the basis of his observations during the broadcast. Additionally, although the plaintiffs had filed motions requesting a review of the broadcast the day before the hearing, the plaintiffs had pending motions for sanctions left unanswered for several months. Also, the defendants were well aware of the court's warnings that it might sanction them if discovery noncompliance continued. As a result, we are not persuaded that *New Hartford* controls the present case.

[38] The defendants did file a motion for a stay the day before the hearing so that Attorney Pattis could address a conflict of interest concern that had

arisen. The trial court denied this motion. The defendants do not challenge this ruling on appeal.

---